# SEALED



**FILED**

Feb 18 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY              s/ vanessac              DEPUTY

1

2

3

4

5

6

7

8

9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHARLOTTE BEVILAQUA, AND MARK GIST,<br><br>  *Plaintiffs,*<br><br>v.<br><br>GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.; LINDEN P. BLUE; ROGER DUKE,<br><br>  *Defendants.* | Case No. '20CV0297 JM   BGS<br><br>**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.***<br><br>**FILED UNDER SEAL pursuant to 31 U.S.C. § 3730(b)(2)**<br><br>**Jury Trial Demanded** |

- 1 -

**INTRODUCTION**

1.      *Qui tam* relators Charlotte Bevilaqua ("Bevilaqua") and Mark Gist ("Gist") (collectively, "Relators"), by their attorneys, individually, and on behalf of the United States of America, file this Complaint against Defendants General Atomics Aeronautical Systems, Inc. ("GA-ASI"), Linden P. Blue, and Roger Duke ("Duke") (collectively, "Defendants") to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, ("FCA" or "False Claims Act"). Relators also seek damages and attorneys' fees for unlawful retaliation in violation of 31 U.S.C. § 3730(h).

2.      Defendants acted to defraud the United States government by incorporating unreasonable and unallowable rates and by incorporating costs associated with non-commercial services into commercial rates into its prime contracts with the United States Army, the United States Navy, the United States Air Force, the United States Customs and Border Protection ("CBP"), the missile Defense Agency ("MDA"), the Defense Advanced Research Projects Agency ("DARPA"), the Federal Acquisition Service ("FAS"), the National Aeronautics and Space Administration ("NASA"), and the United States Special Operations Command ("USSOCOM"), and by extension defrauded the United States of America (collectively the "Government") in violation of False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

3.      GA-ASI is the prime contractor for the MQ-1C Gray Eagle Unmanned Aircraft System ("Gray Eagle") program administer by the U.S. Army. As will be set forth more fully below, Defendants knowingly submitted, caused to be submitted, and/or made or caused to be made, the submission of false claims to the Government through GA-ASI's MQ-1C Gray Eagle contract with the Army, an entity of the DoD, by incorporating unreasonable and unallowable rates into the contract and by misrepresenting the commerciality of its material handling services

- 2 -

in its commerciality determination. Further, GA-ASI incorporates costs associated with non-commercial marketing services into the general and administrative ("G&A") rates of commercial items into its contracts with the United States Army, the United States Navy, the United States Air Force, CBP, MDA, DARPA, FAS, NASA, and USSOCOM. Through information obtained while working at Defendant GA-ASI, Relators believe that Defendants have failed to comply with the Federal Acquisition Regulation ("FAR") requirements for GA-ASI's MQ-1C Gray Eagle contract with the Army and for its contracts with the agencies listed above.

4.      GA-ASI has entered approximately 7,500 contracts with ten government agencies or departments since it began contracting with the United States government in 1994. GA-ASI enters annual prime contracts with the United States Army for the procurement of unmanned aircraft. The current prime contract with the United States Army for the procurement of unmanned aircraft is Contract No. W58RGZ19C0022, worth an estimated $275,000,000. GA-ASI also enters prime contracts with the United States Army for hardware, weapons systems, equipment, maintenance, and technical services in support of the unmanned aircraft.

5.      GA-ASI has established Long Term Agreements ("LTA") with General Atomics Europe, GmbH ("GAE") for engines and parts in support of the Gray Eagle. In addition to the LTAs, GAE procures additional parts for GA-ASI via purchase orders.

6.      GA-ASI has also established contracts and purchase orders with GAE for marketing services and technical services.

7.      GAE and GA-ASI share common ownership and executive leadership.

8.      Through first-hand, personal knowledge obtained by Relators as employees of GA-ASI, Relators believe that Defendants defrauded, and continue to defraud, the Government in the following ways:

- 3 -

a. Improperly allowing products and services to pass through at price, not cost, as if GA-ASI and GAE are subcontractors as opposed to their true relationship, which is one of affiliates;

b. As of April 2018, improperly classifying transactions between GA-ASI and GAE as commercial by incorporating rates associated with non-commercial services into the rates for commercial items;

c. Charging unreasonable and unjustifiable rates for parts and services provided;

d. Failing to adhere to FAR requirements to implement a cost accounting system and timekeeping system at GAE;

e. Charging the Government for unallowable expenses such as alcohol and equipment not allocable to the contract to which the equipment is charged; and

f. Failing to audit the rates charged by GAE.

9.      At all times relevant to this complaint, Defendants knowingly engaged in the above activity in order to increase the payments received from the Government via their prime contracts with the above listed agencies and departments.

10.     Defendants knowingly submitted false or fraudulent documents to the Government by leading the Government to believe that Defendant GA-ASI would comply with the FAR and Contract requirements.

11.     Defendants knowingly submitted false or fraudulent claims for payment to the Government through the use of purchase orders for payment in amounts that reflect unreasonable and excessive costs for parts and services provided by GAE.

- 4 -

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a). Relators' federal cause of action for unlawful retaliation is authorized by 31 U.S.C. § 3730(h).

13. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because GA-ASI is headquartered in this judicial district and Blue resides in this judicial district.

14. Venue is proper in this Court under 28 U.S.C. §§ 1391(c) and 31 U.S.C. § 3732(a) because GA-ASI is headquartered in San Diego, California, the complained-of illegal acts occurred within this judicial district, and Blue resides in this judicial district.

**THE PARTIES**

15. Relator Bevilaqua is a citizen of the United States and a resident of San Diego, California.

16. Charlotte Bevilaqua has worked at GA-ASI for seven years as a subcontract administrator ("SCA").

17. Prior to working at GA-ASI, Bevilaqua worked at Cubic and Lockheed Martin.

18. Bevilaqua has extensive experience in subcontracting, especially related to international contracting and intercompany transactions among affiliate companies.

19. In March 2018, at the recommendation of her manager, Bevilaqua applied for the position as SCA of a team that leads GA-ASI's contracting with GAE.

20. Relator Gist is a citizen of the United States and a resident of Escondido, California.

- 5 -

21.     Mark Gist has sixteen years of domestic and international operations management experience in research and development, as well as production and sustainment activities in aerospace and defense.

22.     Gist has worked at GA-ASI since January 2004.

23.     Gist worked as the Director of International Industrial Participation and Offsets for GA-ASI from April 2013 to January 2020.

24.     In January 2020, Gist was demoted to a program director of GA-ASI's Sovereign Payload, NATO pod and Systems Integration Lab ("SIL").

25.     Defendant GA-ASI is a corporation headquartered in San Diego, California. GA-ASI supplies the United States Army with various Remotely Piloted Aircraft ("RPA") platforms, including the Gray Eagle. GA-ASI also provides engineering services in support of its products.

26.     Defendant Linden P. Blue ("Linden P. Blue") is the Chief Executive Officer ("CEO") of GA-ASI. Linden P. Blue is also one of the managing directors of General Atomics Europe, GmbH.

27.     Defendant Roger Duke is the Vice President of Contracts and Procurement at GA-ASI.

28.     GA-ASI is a wholly owned subsidiary of General Atomics ("GA").

29.     GA is a corporation headquartered in San Diego, California. GA specializes in research and technology development. GA is a wholly owned subsidiary of General Atomics Technologies Corporation ("GATC").

30.     GATC is a subsidiary of Tenaya Corporation ("Tenaya"), a Delaware corporation.

31.     Neal Blue, the father of Linden P. Blue, is the Chairman of the Board of Directors and the President of Tenaya.

- 6 -

32.     General Atomics Europe, GmbH ("GAE") is a limited liability company headquartered in Dresden, Germany. GAE is a subsidiary of General Atomics.

33.     GAE provides unmodified engines, parts, material handling services, marketing services, and technical services to GA-ASI. GAE was formerly known as Spezialtechnik Dresden, GmbH.

## FACTUAL ALLEGATIONS

### I.     Background on the False Claims Act

34.     The Federal False Claims Act prohibits knowingly presenting, or causing to be presented, to the federal Government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

35.     The FCA also prohibits conspiring to commit any of the violations described in 31 U.S.C. § 3729(a)(1). *See* 31 U.S.C. § 3729(a)(1)(C).

36.     The term "knowingly" as used in the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id.*

37.     Any person who violates the FCA is liable for civil penalties. The amount of the civil penalty per each false claim resulting from these violations of the False Claims Act is currently listed as $11,181 to $22,363 per false claim for penalties assessed after January 29, 2018, when the associated violation occurred after November 2, 2015. 28 C.F.R. § 85.5.

- 7 -

## II.   Background on the Federal Acquisition Regulation

### a.   Overview

38.     The Federal Acquisition Regulation ("FAR") is the principal set of regulations governing the acquisition of goods and services by the executive agencies of the United States.

39.     The FAR was established to codify uniform policies for the acquisition of goods and services by executive agencies.

40.     The FAR includes provisions governing each stage of the acquisition process, including competition and acquisition planning, contracting methods and contract types, general contracting requirements, and contract management.

41.     For the purposes of the FAR, acquisition means the acquiring by contract with appropriated funds of supplies or services by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, or evaluated. FAR Part 2.101.

42.     Acquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, contract financing, contract performance, contract administration, and those technical and management functions directly related to the process of fulfilling agency needs by contract. *Id.*

43.     The requirements for acquisitions as set forth in the FAR apply to all contracts involving acquisitions by the federal government. The provisions of the FAR are applicable to federal contractors through the incorporation of the mandatory contract clauses and provisions set forth in the FAR into all contracts between the federal government and its contractors. *See* FAR Part 52.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**b.**     **Provisions Regarding Subcontractors and Affiliates**

44.     Acquisition contracts often include complex supply chains that involve a primary contractor and a number of secondary entities, including subcontractors and affiliates.

45.     The FAR sets forth requirements that differ depending on whether an entity working with a prime contractor on an acquisition for the Government is a subcontractor or an affiliate.

46.     For the purposes of the FAR, business concerns, organizations, or individuals are affiliates of each other if, directly or indirectly, either one controls or has the power to control the other, or a third party controls, or has the power to control, both. FAR Part 9.403.

47.     Indicia of control include, but are not limited to, interlocking management or ownership, identity of interests among family members, shared facilities and equipment, common use of employees, or a business entity organized following the debarment, suspension, or proposed debarment of a contractor which has the same or similar management, ownership, or principal employees as the contractor that was debarred, suspended, or proposed for debarment. *Id.*

48.     The FAR sets forth different obligations and responsibilities for subcontractors and affiliates with regard to the transfers of goods and services within the supply chain.

49.     Allowance for all materials, supplies, and services that are sold or transferred between affiliates of the contractor under a common control must be on the basis of cost incurred, unless an exception applies. FAR Part 31.205-26(e).

50.     To sell or transfer materials, supplies, and services on the basis of cost means that the affiliate provides the required materials, supplies, and services to the contractor at the same cost incurred by the affiliate for the materials, supplies, or services.

- 9 -

51.     To sell or transfer materials, supplies, and services on the basis of price means that the affiliate provides the required materials, supplies, and services to the contractor at the amount of the cost incurred by the affiliate for the materials, supplies, or services plus a markup to account for profit.

52.     If a contractor qualifies for one of the exceptions, allowance may be made to transfer materials, supplies, or services from the affiliate to the contract at price instead of at cost. Allowance may be at price when:

      a.    It is the established practice of the transferring organization to price interorganizational transfers at other than cost for **commercial work** of the contractor or any division, subsidiary or affiliate of the contractor under a common control; and

      b.    The item being transferred qualifies for an exception under 15.403-1(b) (see below paragraph) and the contracting officer has not determined the price to be unreasonable.

      FAR Part 31.205-26(e)(1)-(2).

53.     FAR Part 15.403-1(b) describes exceptions to the certified cost or pricing data requirements, which are outlined in the Truth in Negotiations Act ("TINA"), described below. *See* 10 U.S.C. § 2306a; *see also* 41 U.S.C. §§ 3501-3509. FAR Part 15.403-1(b) states that the contracting officer shall not require certified cost or pricing data to support any contracts, subcontracts, or modifications:

      a.    When the contracting officer determines that prices agreed upon are based on adequate price competition,

- 10 -

b.      When the contracting officer determines that prices agreed upon are based on prices set by law or regulation,

c.      **When a commercial item is being acquired,**

d.      When a waiver has been granted,

e.      When modifying a contract or subcontract for commercial items.

FAR Part 15.403-1(b)(1)-(5).

**c.    Provisions Regarding Commercial and Non-Commercial Items**

54.    For the purposes of the FAR, a commercial item is any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and

a.      Has been sold, leased, or licensed to the public; or,

b.      Has been offered for sale, lease, or license to the general public.

*See* FAR Part 2.101.

55.    An item may be classified as commercial if it evolved from such an item as described above through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation. *Id.*

56.    Put simply, a material, supply, or service may be commercial if it is available on the marketplace for any purchaser to purchase at a cost ascertainable by the purchaser.

57.    An item may be classified as commercial if it meets the requirements above, but for modifications of a type customarily available in the commercial marketplace, or minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. *Id.* [hereinafter "commercial of-a-type"].

- 11 -

58.     Minor modifications mean modifications that 1) do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or 2) change the purpose of a process. *Id.*

59.     Installation services, maintenance services, repair services, training services, or other services may be classified as commercial if:

    a.     Such services are procured for support of a commercial item, regardless of whether such services are provided by the same source or at the same time as the item; **and**

    b.     The source of such services provides similar services contemporaneously to the general public under terms and conditions similar to those offered to the Federal Government.

*See* FAR Part 2.101 (emphasis added).

60.     Services may also be considered commercial if they are services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed or specific outcomes to be achieved and under standard commercial terms and conditions.

61.     Contracts and subcontracts for the acquisition of commercial items are exempt from the FAR's Cost Accounting Standards. 48 C.F.R. § 9903.201-1. The FAR's Cost Accounting Standards are outlined in FAR Part 30 and described in section II.d. below.

62.     Contracts and subcontracts for the acquisition of commercial items are also exempt from TINA. *See* FAR Part 15.403-1(b)(3); *see also* FAR Part 15.403-1(c)(3). TINA is described in section IV.a. below.

- 12 -

**d.      Provisions Regarding Cost Accounting Standards**

63.      The Cost Accounting Standards Board ("CASB") is an independent board in the Office of Federal Procurement Policy. 41 U.S.C. § 1501(a).

64.      The CASB sets forth the cost accounting standards ("CAS") to be used by Federal contractors. 41 U.S.C. § 1501(c).

65.      The cost accounting standards adopted by the CASB are codified in 48 C.F.R. §§ 9904.400 *et seq*. The FAR incorporates these cost accounting standards in FAR Part 30.101(b).

66.      The rules for determining whether a proposed contract or subcontract is exempt from CAS are described in 48 C.F.R. § 9903.201-1. There are 9 categories of contracts and subcontracts that are exempt from CAS. Among them are:

   a.   Contracts and subcontracts authorized in 48 C.F.R. 12.207 for the acquisition of commercial items, and

   b.   Negotiated contracts and subcontracts not in excess of the TINA threshold, as adjusted for inflation. *See* 41 U.S.C. § 1908; 41 U.S.C. § 1502(b)(1)(B)).

67.      The CASB has adopted 19 cost accounting standards. Among them are regulations regarding:

   a.      Consistency in Estimating, Accumulating, and Reporting Cost

   b.      Consistency in Allocating Costs Incurred for the Same Purpose

   c.      Accounting for Unallowable Costs

   d.      Use of Standard Costs for Direct Material and Direct Labor

   e.      Allocation of Business Unit General and Administrative Expenses to Final Cost Objectives

   f.      Allocation of Direct and Indirect Costs

- 13 -

g.      Accounting for Independent Research and Development Costs and Bid and Proposal Costs

*See generally* 48 C.F.R. 9904.400-9904.420.

68.      Government contractors that administer contracts that do not meet one of the exceptions set forth in 48 C.F.R. § 9903.201-1 are responsible for implementing cost accounting systems that are compliant with CAS.

**e.**      **Provisions Regarding Allowability**

69.      The FAR sets forth regulations that govern the allowability, reasonableness, and allocability of costs charged to the federal government.

70.      A cost is allowable only when the cost complies with all of the following requirements:

a.      Reasonableness

b.      Allocability

c.      Standards promulgated by the CASB, if applicable, otherwise, generally accepted accounting principles ("GAAP") and practices appropriate to the circumstances

d.      Terms of the contract

e.      Any other limitations set forth in FAR Part 31

*See* FAR Part 31.201-2.

71.      A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost

- 14 -

principles in FAR Subpart 31.201 and agency supplements. The contracting officer may disallow all or part of a claimed cost that is inadequately supported. FAR Part 31.201-2(d).

72.     When contractor accounting practices are inconsistent with FAR Part 31.2, costs resulting from such inconsistent practices in excess of the amount that would have resulted from using practices consistent with this subpart are unallowable. FAR Part 31.201-2(c).

73.     A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship. A cost is allocable if it:

      a.     Is incurred specifically for the contract;

      b.     Benefits both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received; or

      c.     Is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown.

*See* FAR Part 31.201-4.

74.     Where a cost does not meet the requirements set forth in FAR Part 31.201, it is unallowable.

75.     An expressly unallowable cost is a particular item or type of cost which, under the express provisions of an applicable law, regulation, or contract, is specifically named and stated to be unallowable. 48 C.F.R. § 9904.405-30(a)(2).

76.     An unallowable cost is any cost which, under the provisions of any pertinent law, regulation, or contract, cannot be included in prices, cost reimbursements, or settlements under a Government contract to which it is allocable. 48 C.F.R. § 9904.405-30(a)(4).

77.     A directly associated cost is any cost which is generated solely as a result of the incurrence of another cost, and which would not have been incurred had the other cost not been incurred. 48 C.F.R. § 9904.405-30(a)(1).

78.     Costs that are expressly unallowable or mutually agreed to be unallowable, including mutually agreed to be unallowable directly associated costs, shall be identified and excluded from any billing, claim, or proposal applicable to a Government contract. When an unallowable cost is incurred, its directly associated costs are also unallowable. FAR Part 31.201-6(a).

79.     Expressly unallowable costs include interest expenses, donations and contributions, entertainment, contingencies, bad debts, fines and penalties, goodwill, losses on contracts, and organizational expenses, alcohol, promotion, costs associated with items and services for personal use, profit distributions, legal costs, and travel costs that exceed applicable per diem rates. *See generally* FAR Part 31.205.

80.     When submitting a proposal to the federal government, contractors must certify that unallowable costs have not been incorporated into indirect cost rates or billing rates. *See* FAR Part 42.700-42.704.

81.     Pursuant to 10 U.S.C. § 2324(h) and 41 U.S.C. § 4307, contractors who submit a proposal to the federal government must include a certificate of indirect costs.

82.     The penalties for submission of unallowable costs in final indirect cost rate proposals or the final statement of costs incurred or estimated to be incurred under a fixed-price incentive contract are prescribed in 10 U.S.C. § 2324(a) and 41 U.S.C. § 4303. *See* FAR Part 42.703-2(e); FAR Part 42.709-1(a)(1)-(2).

- 16 -

**f.      Provisions Regarding Reasonableness of Costs**

83.     Final agreed-to prices in government contracts must be fair and reasonable. *See* FAR Part 15.404-1.

84.     Pursuant to FAR Part 15.404-1, the contracting officer is responsible for evaluating the reasonableness of offered prices.

85.     Contractors are responsible for bringing to the attention of the contracting officer any discrepancies or mistakes of fact contained in certified cost or pricing data, or data other than certified cost or pricing data. *See* FAR Part 15.404-1(a)(6).

**g.      Provisions Regarding Required Contract Clauses**

86.     FAR Part 52 gives instructions for using provisions and clauses in solicitations and contracts.

87.     Contractors who submit solicitations to enter into, or ultimately do enter into contracts with the federal government are required to include the provisions and contract clauses applicable to the solicitation or contract pursuant to the regulations set forth in FAR Part 52.

88.     When a solicitation provision or contract clause uses a word or term that is defined in the FAR, the word or term has the same meaning as the definition in FAR 2.101 in effect at the time the solicitation was issued, unless:

    a.      The contract provides a different definition;

    b.      The contracting parties agree to a different definition;

    c.      The part, subpart, or section of the FAR where the provision or clause is prescribed provides a different meaning; or

    d.      The word or term is defined in FAR Part 31, for use in the cost principles and procedures.

- 17 -

*See* FAR Part 52.202-1.

**III.     Background on the Defense Federal Acquisition Regulation Supplement ("DFARS")**

    **a.      Overview**

89.     The term "defense acquisition system" refers to the workforce engaged in carrying out the acquisition of property and services for the DoD, the management structure responsible for directing and overseeing the acquisition of property and services for the DoD; and the statutory, regulatory, and policy framework that guides the acquisition of property and services for the DoD. 10 U.S.C. § 2545(2).

90.     The defense acquisition system exists to manage the investments of the United States in technologies, programs, and product support necessary to achieve the national security strategy prescribed by the President pursuant to section 108 of the National Security Act of 1947 (50 U.S.C. § 3043) and to support the United States Armed Forces. DFARS art 201.101(1).

91.     The DFARS is a supplement to the FAR that provides DoD-specific acquisition regulations that defense acquisition system officials and contractors doing business with the DoD must follow in the procurement process for goods and services.

92.     The DFARS may augment certain requirements set forth in the FAR depending on the nature of the contract or subcontract.

    **b.      Commercial Item Determinations**

93.     When using FAR Part 12 procedures for acquisitions exceeding $1 million in value, except for acquisitions made pursuant to FAR Part 12.102(f)(1), (a subpart not applicable to the facts in this Complaint) the contracting officer is required to include a commercial item determination ("CID") in the contract file. *See* DFARS 212.1.

- 18 -

94.     The CID essentially conveys to the government that an item or service meets the definition for "commercial" as set forth in FAR Part 2.101.

95.     When a CID relies on subsections (1)(ii) [the item has been offered for sale, lease, or license to the general public], (3) [commercial of-a-type items], (4) [any combination of items that are of a type customarily combined and sold in combination to the general public], or (6) [services of a type offered and sold competitively in substantial quantities in the commercial marketplace] of the "commercial item definition at FAR Part 2.101, the contracting officer must also obtain approval of the commerciality determination at one level above the contracting officer."

96.     Contractors are responsible for determining whether a particular subcontract item meets the definition of a commercial item. Contractors are expected to exercise reasonable business judgment in making such determinations, consistent with the guidelines for conducting market research as set forth in FAR Part 10. DFARS 244.402(a).

## IV.     **Background on the Truth in Negotiations Act**

97.     TINA requires contractors to provide certified cost or pricing data to the government for acquisitions at or below the simplified acquisition threshold. *See* 10 U.S.C. § 2306a; *see also* 41 U.S.C. §§ 3501-3509.

98.     The simplified acquisition threshold is the dollar amount below which a contractor may purchase property or services using small purchase methods, also known as simplified acquisition procedures.

99.     Simplified acquisition procedures are a set of streamlined procedures designed for the purchase of relatively simple supply or service requirements.

- 19 -

100.   The FAR requires that contracting officers obtain certified cost or pricing data from the contractor pursuant to TINA where the contracting officer concludes that none of the exceptions specified in the FAR apply to the contract. *See generally* FAR Part 15.403-4.

101.   A contractor or subcontractor required to submit cost or pricing data under TINA is required to certify that, to the best of the person's knowledge and belief, the cost or pricing data submitted are accurate, complete, and current. *See* 10 U.S.C. § 2306a(a)(2).

102.   If the United States makes an overpayment to a contractor under a contract subject to 10 U.S.C. § 2306a (TINA) and the payment was due to the submission by the contractor of defective cost or pricing data, the contractor shall be liable to the United States for interest on the amount of such overpayment, *see* 10 U.S.C. § 2306a(f)(1)(A)(i)-(ii), and, if the submission of such defective data was a knowing submission, for an additional amount equal to the amount of the overpayment, *see* 10 U.S.C. § 2306a(f)(1)(B).

## V.   **Factual Allegations**

### a.   **GA-ASI is a supplier for the United States Army**

103.   GA-ASI supplies the United States Army with the Gray Eagle.

104.   The Gray Eagle is an unmanned aircraft designed for reconnaissance, surveillance, target acquisition, and attack operations. The United States Army uses the Gray Eagle for surveillance, convoy protection, improvised explosive device detection, close air support, communications relay, and weapons delivery systems.

105.   The Gray Eagle is powered by a modified version of the Thielert Centurion 2.0.

106.   The Centurion 2.0 is a two-liter, turbo-charged, four-cylinder heavy-fuel engine. The engine is also sold as the Continental Motors CD-155.

- 20 -

107.    GA-ASI has supplied the Army with the Gray Eagle aircraft since 2004. GA-ASI has produced approximately 150 Gray Eagle aircraft.

   b.  **GAE is an affiliate of GA-ASI that supplies GA-ASI with heavy-fuel aircraft engines, spare parts, material handling services, marketing services, and technical services.**

108.    GAE, formerly known as Spezialtechnik Dresden GmbH, is GA-ASI's supplier of aircraft engines, spare parts, and technical and marketing services.

109.    GA-ASI and GAE use LTAs for the procurement of Thielert Centurion 2.0 engines, parts, and material handling services, known internally as "value-added services." GA-ASI renews its LTA with GAE every two years. GA-ASI's 2018/2019 LTA expired on December 31, 2019. GA-ASI is currently negotiating its 2020/2021 LTA. GAE procures additional parts for GA-ASI that are not included in the LTA using purchase orders.

110.    According to GA-ASI Director of Government Accounting and Compliance, Nicholas Sanders, GA-ASI and GAE have also entered into a consulting agreement for technical and engineering services provided by GAE. The consulting agreement is supported by Time and Materials ("T&M") Orders. The consulting agreement has been in place since 2014. The consulting agreement was renewed in January 2018.

111.    Additionally, GA-ASI enters into numerous other Time & Material purchase orders for technical services and engineering services.

112.    Finally, GA-ASI and GAE enter into a Marketing Services Agreement annually. Under the Marketing Services Agreement GAE provides non-commercial international marketing services for GA-ASI. The Marketing Services Agreement is a firm-fixed price agreement. The Marketing Services Agreement is supported by purchase orders. GAE's

- 21 -

marketing services are unrelated to the procurement of engines and parts for the Gray Eagle. GA-ASI and GAE renewed the Marketing Services Agreement in May 2018.

113.    Per the 2018/2019 LTA, GAE supplies GA-ASI with Thielert Centurion engines, as well as 92 spare parts for the engine for GA-ASI's Gray Eagle contract with the Army. GAE also supplies GA-ASI with other parts that are not specifically defined in the LTA.

114.    GA-ASI has contracted with GAE for the supply of heavy-fuel aircraft engines, and parts since 2013.

115.    GAE has been providing marketing services to GA-ASI since 2010.

116.    GAE purchases its engines from Technify Motors GmbH ("Technify"), a third-party supplier.

117.    After purchasing heavy-fuel engines from Technify, GAE represents that it unpackages and inspects the engines and spares. GAE repackages the engines and spare parts and ships them to GA-ASI.

118.    Despite GAE claiming to inspect the engines, GAE does not have all the tools a typical quality control department would have, and GA-ASI fully inspects the engines when they are ultimately delivered to GA-ASI, as if no previous inspection had been performed on the engines.

119.    GA-ASI and GAE are affiliated entities as defined by the FAR through their common control and management. *See* FAR Part 2.101; *see also* FAR Part 9.403. Linden P. Blue is the CEO of GA-ASI and a managing director of GAE.

120.    Linden P. Blue's role in both companies is significant and more than a titular, figure head role. For example, as the CEO of GA-ASI, Linen P. Blue is directly responsible for managing overall operations and resources of GA-ASI and acts as the main point of

- 22 -

3389c36e78c172bc

communication between GA-ASI's board of directors and GA-ASI's corporate officers. As a managing director of GAE, Linden P. Blue plays a substantial role in major corporate decisions, such as major acquisitions.

121.    In the LTA, GA-ASI and GAE properly identify the relationship between the two entities as that of affiliates.

122.    However, despite being affiliates in truth, and identifying the relationship between GAE and GA-ASI as affiliates in the LTA, GA-ASI does not properly charge the government for GAE's parts, material handling, or marketing services, as will be outlined below.

123.    GAE transfers its parts and services to GA-ASI at price, not cost as would otherwise be required for affiliate companies.  GA-ASI justifies the at-price transfer on the basis that it is necessary to ensure compliance with Germany's arm's length compensation requirements set forth in German tax laws.

124.    Germany applies the "at arm's length" principle to transactions of related parties. Germany's Corporation Income Tax Act prohibits reduction of taxable income via hidden distribution of profits. *See* KÖRPERSCHAFTSTEUERGESETZ [KStG] [BUNDESGESETZ], § 8, para. 3 (Ger.).

125.    GAE transfers hardware and services to GA-ASI at price by incorporating an 8% profit rate on commercial items and an 11% profit rate on commercial-of-a-type items.

126.    GAE also transfers technical services at price by incorporating an 8% profit rate on services.

127.    Upon information and belief, GAE also transfers marketing services at price by incorporating an 8% profit rate on services. However, the profit rate on marketing services has never been detailed and cannot be calculated due to GAE's lack of cost accounting systems.

128.    GA-ASI has internal policies in place that address non-compliance with the FAR. Corporate Policy-305 ("CP-305"), an internal policy, prohibits profit on inter-affiliate work.

129.    Thus, in an effort to ensure compliance with the FAR and with its own internal policy, CP-305, GA-ASI allows the transfer of goods and services between GAE and GA-ASI at price but then alleges to remove the profit on a separate line item as an unallowable cost on its purchase orders.

130.    However, as outlined below, GA-ASI does not have adequate cost accounting systems in place to verify that the 8% and 11% unallowable rates are profit. Importantly, these figures are assigned as profit almost out of thin air, without any justification that 8% profit rate on commercial items and an 11% profit rate on commercial-of-a-type items is accurate.

131.    Further, in January 2020, Linden P. Blue issued a company-wide waiver to CP-305.

132.    In violation of FAR Part 31.205-26(e), GA-ASI's waiver of CP-305 effectively permits the transfers of commercial inter-affiliate work at price, which GA-ASI improperly passes onto the Government.

133.    As is industry standard, GA-ASI publishes and circulates established procurement procedures for most situations regarding GA-ASI's procurements. However, contrary to industry standard and internal protocol, GA-ASI does not publish or circulate established procurement procedures for procurements from GAE.

134.    The exceptions to FAR Part 31.205-26(e), which would allow for materials, supplies, and services that are sold or transferred between affiliates of the contractor under a common control to be transferred at price, as opposed to cost, do not apply to GAE's marketing and technical services because:

- 24 -

     a.    The contracting officer has not determined that the prices agreed upon are based on adequate price competition,

     b.    The contracting officer has not determined that the prices are set by law or regulation,

     c.    The services are not commercial,

     d.    A waiver has not been granted by the federal government, and

     e.    A modification has not been made to a subcontract for solely commercial items.

*See* FAR Part 31.205-26(e)(2); FAR Part 15.403-1(b)(1)-(5).

135.    In violation of FAR Part 31.201-6, GA-ASI then passes the costs on to the government.

**c.    GA-ASI violates the FAR by designating non-commercial material handling services as commercial in order to avoid the FAR's cost accounting standards**

136.    Pursuant to DFARS 244.402(a), GA-ASI supports its contract with the United States Army with a commercial item determination.

137.    Prior to April 2018, GA-ASI classified the engines and parts provided by GAE as non-commercial and classified GAE's marketing, technical, and material handling services as non-commercial.

138.    In or around April 2018, GA-ASI began designating all of GAE's engines, parts, and material handling services as commercial parts and services.

139.    When Bevilaqua became SCA of the team that leads GA-ASI's contracting with GAE, she was instructed by her supervisor, Gabriel "Vic" Pascarella ("Pascarella") and Derek

Andrews ("Andrews"), the Vice President of Procurement, to write the CID for GAE's engines, parts, and material handling services.

140.    Bevilaqua, who was newly assigned to the team did not have all of the information necessary to complete the CID and asked for additional information and clarification from Pascarella and Andrews.

141.    On April 12, 2018, Bevilaqua sent an email to Pascarella and Andrews explaining that she met with an employee from Capital Edge Consulting, an auditing and consulting firm hired by GA-ASI, and discovered that extensive revisions and additional information would be required to support a determination that the LTA was commercial.

142.    On April 18, 2018, Capital Edge approved the CID. However, Warren Cintron, another GA-ASI employee, identified a number of remaining issues with the CID.

143.    In response, Pascarella instructed Cintron to send the CID to him so he could sign it.

144.    GA-ASI, at the direction of Duke, through the instruction of Pascarella and Andrews ultimately executed the CID and designated all of GAE's engines, parts, and material handling services as commercial parts and services.

145.    However, in order for GAE's material handling services to be classified as commercial, they must be procured for support of a commercial item *and* the source of such services must provide similar services contemporaneously to the general public under terms and conditions similar to those offered to the Federal Government. *See* FAR Part 2.101.

146.    Because GAE has no other customers, it does not provide its material handling services to the general public.

147.     Therefore, these services should be classified as non-commercial because they do not meet the definition of "commercial" set forth in the FAR. *See* FAR Part 2.101.

148.     By classifying non-commercial services as commercial with GAE, GA-ASI avoids the CAS requirements set forth in FAR Part 30.101(b).

149.     GA-ASI incorporates fixed charges for GAE's labor, such as quality inspection and order processing, into the fixed price rates for the procurement of engines and parts.

150.     GA-ASI violates the FAR when it designates GAE's material handling services as commercial when they should be designated as non-commercial.

151.     GAE includes the rates associated with its support services into the price of the commercial hardware it supplies to GA-ASI on its 2018/2019 LTA as follows:

     a.     General & Administrative ("G&A") Expenses: 12.77%

     b.     Indirect rate of 10.07% applied to all commercial hardware

     c.     Direct rate of 10% applied to parts with a unit purchase price of greater than 10€

     d.     Direct rate of 35% applied to parts with a unit purchase price of less than 10€

152.     The engines, parts, and associated labor rates are included in GA-ASI's direct and indirect rates in its LTAs, purchase orders, and engineering service orders with GAE.

153.     Until Summer 2019, GAE did not have a timekeeping system to accurately track employees' time for services.

154.     In Summer 2019, GAE implemented a timekeeping system for its marketing and technical services. However, GAE's timekeeping system for the labor associated with its material

handling (e.g., quality inspection) is not in compliance with the CAS set forth in the FAR or DFARS.

155.     FAR Part 31.201-2(d) states that a contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation which is adequate to demonstrate *that costs claimed have been incurred* and are allocable to the contract, and comply with applicable cost principles in FAR Part 31.2 and agency supplements.

156.     Historically, GA-ASI has not required GAE to track the hours worked by its employees engaged in material handling or engineering services.

157.     Instead, labor charges are based on an estimate of the average amount of labor at an average rate.

158.     The primary technician at GAE for technical services is Erik Bollen.

159.     Bollen's technical services account for approximately 10% of GAE's business with GA-ASI.

160.     Bollen's hourly rates were historically not subject to cost analysis; instead, GAE conducted price analysis on the rates and compared them to market rates for similar services.

161.     GAE incorporates these labor charges into the direct and indirect rates of its commercial hardware that it passes on to GA-ASI and GA-ASI passes onto the Army under the Gray Eagle contract.

162.     This is improper because Bollen does not provide the services in substantial quantities to other customers.

163.     Thus, GA-ASI violates the FAR by designating GAE's material handling costs as non-commercial to avoid implementing an adequate CAS, and includes the rates associated with

- 28 -

material handling services into its procurements for engines and parts, which has been designated as commercial and non-commercial.

      **d.**    **GA-ASI violates the FAR by incorporating the costs associated with non-commercial marketing services into its rates for the procurement of commercial items.**

164.    GAE's marketing services account for approximately 5% of GAE's business with GA-ASI.

165.    As with GAE's other procurements, it is believed that GAE adds 8% profit to its marketing service purchase orders, which is subsequently removed by GA-ASI.

166.    The Marketing Service Agreement includes fixed labor rates for GAE employees who provide marketing services.

167.    Before Summer 2019, GAE did not have a timekeeping system in place.

168.    In the Summer of 2019, GAE implemented a timekeeping system. However, the timekeeping system is not in accordance with the regulations set forth in the FAR.

169.    GAE tracks employee time in terms of days worked. Where a workday includes work that pertains to GA-ASI, GAE bills the entire day to GA-ASI.

170.    GA-ASI then passes these costs onto the government.

171.    GAE's timekeeping system for its labor associated with marketing services is not in compliance with the CAS set forth in the FAR or DFARS.

172.    FAR Part 31.201-2(d) states that a contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, and are *allocable to the contract*, and comply with applicable cost principles in FAR Part 31.2 and agency supplements.

- 29 -

173.   Because GAE charges GA-ASI for entire days of labor even where the employee only used parts of those days to provide marketing services to GA-ASI, the portion of the day that was not used to provide marketing services is not allocable to the contract. These costs are therefore unallowable.

174.   GAE charges GA-ASI for its marketing services via invoices.

175.   GAE then incorporates the rates associated with the marketing services into the indirect and G&A rates for all of GA-ASI's commercial procurements.

176.   However, GAE does not provide marketing services to any other customers as would be required to qualify GAE's marketing services provided for GA-ASI as commercial services.

177.   Therefore, GAE incorporates charges for non-commercial services into commercial item rates.

178.   GA-ASI then passes these charges onto the government via its prime contracts with the United States Army, the United States Navy, the United States Air Force, CBP, MDA, DARPA, FAS, NASA, and USSOCOM.

   e.   **GA-ASI violates the FAR by incorporating the costs associated with non-commercial marketing services into its rates for the procurement of commercial items.**

179.   In addition to material handling and marketing services, GAE provides technical services to GA-ASI.

180.   GAE's technical services include engineering expertise, tooling design, independent research and development support, performance-based logistics, and engineering overhead costs.

181.   GAE does not offer or sell its technical services in the commercial marketplace.

- 30 -

182.    GAE's technical services are therefore non-commercial.

183.    As with GAE's material handling and marketing services, GAE lacks a proper timekeeping system to ensure that costs associated with its technical services are allocable to its contract with GA-ASI.

184.    GAE conducted internal compliance evaluations in 2018 and 2019 to address the inadequate timekeeping and accounting systems.

185.    The accounting and compliance audits were required to incorporate GAE in GA-ASI's European sustainment network ("ERSN"), which is responsible for managing suppliers and vendors who conduct repair and maintenance on GA-ASI's aircraft.

186.    Cliff Stone ("Stone"), the VP of Sustainment, suggested GA-ASI consider a well-known, well qualified, fully equipped company operating out of the Netherlands serve as the hub for the ERSN. This would also have helped GA-ASI to meet its offset obligation in the Netherlands. Linden P. Blue overrode Stone's recommendation and demanded that a sham "trade study" be performed by a third party. The end result was that GAE was chosen to serve as the hub for ERSN.

187.    However, GAE has not implemented the necessary systems to ensure compliance with the CAS.

188.    Further, GAE continues to incorporate costs associated with non-commercial services into its commercial rates.

189.    GA-ASI has traditionally improperly passed these costs onto the federal government via its prime contracts with the United States Army, the United States Navy, the United States Air Force, CBP, MDA, DARPA, FAS, NASA, and USSOCOM.

**f.** **GA-ASI violates the FAR by charging unreasonable rates for services that provide relatively little value to the government**

190.  In addition to improperly classifying its services as commercial and failing to implement adequate cost accounting and timekeeping systems, GAE, which is overseen by Linden P. Blue, charges unreasonable rates for its services to GA-ASI. GA-ASI then passes GAE's unreasonable rates to the Army.

191.  The industry standard for material handling services varies depending on the nature of the procurement but is generally less than 5%.

192.  GAE charges between 10-35%, depending on the type of hardware for material handling expenses.

193.  GAE's material handling services provided little value-added to the procurement of the engines and spare parts.

194.  GAE's material handling services include quality inspection and repackaging, which are standard services, not additional services, in the procurement industry.

195.  However, GAE's rates associated with its material handling services far exceed industry standard.

196.  GAE has not conducted sufficient price or cost analysis to support a determination that the rates associated with its services are reasonable.

197.  Further, because GAE charges the cost of labor for marketing services even when employees only used parts of those days to provide marketing services to GA-ASI, the cost is unreasonable on its face because portions of the cost are not allocable and therefore not allowable.

198.  In violation of FAR Part 15.404, GA-ASI passes these unreasonable costs onto the federal government.

- 32 -

### g.   GA-ASI charges the government for other unallowable costs

199.   GAE also incorporates unallowable costs into its G&A expenses.

200.   On numerous occasions, GAE has incorporated alcohol, an expressly unallowable cost, into the G&A expenses applied to its commercial hardware. *See* FAR Part 31.001.

201.   GAE has also incorporates unallowable costs into its G&A expenses.

202.   Among these unallowable costs were costs associated with the purchase of mining equipment. This cost is unallowable because it is not allocable to the contract. The mining equipment exceed the scope of the allocable expenses outlined in the contract.

203.   GA-ASI violates the FAR by passing expressly unallowable and unallocable expenses onto the government.

### h.   GA-ASI transfers spare parts to common stock to avoid simplified acquisition thresholds

204.   GA-ASI often transfers spare parts from GAE to common stock instead of allocating them directly to contracts with the United States Army.

205.   However, all of the spare parts procured by GAE are in support of the Centurion 2.0.

206.   Therefore, the end user of the spare parts is always the United States Army.

207.   By transferring parts to common stock, GA-ASI reduces the value of procurements contracts below the simplified acquisition threshold.

208.   GA-ASI is thus able to avoid TINA and CAS obligations for many of its procurements to the United States Army.

- 33 -

i.   **In preparation for ESRN, GA-ASI hires Capital Edge to perform an internal audit**

209.   In or around 2016, GA-ASI was selected for a Contractor Purchasing System Review ("CPSR") audit by DCMA. In order to pass the audit, GA-ASI hired Capital Edge, an external auditing and consulting company.

210.   In or around May 2018, after Bevilaqua started raising concerns about GA-ASI's noncompliance with contracting regulations, GA-ASI asked Capital Edge to address the issues.

211.   In November 2018, GA-ASI contracted with Capital Edge to conduct an internal audit of GA-ASI and GAE.

212.   The owners of Capital Edge are known friends of Linden P. Blue and Roger Duke.

213.   During and after Capital Edge's audits, Roger Duke and Todd Kawai would regularly attend events with the owners of Capital Edge that included cigars and fine liquor.

214.   At one point during Capital Edge's audit, an employee of Capital Edge approached Bevilaqua and told her that he "hope[s] they don't pin this on you," referring to the numerous noncompliance issues at GA-ASI.

215.   Capital Edge completed the audit without addressing GA-ASI's noncompliance issues.

216.   Additionally, Nicholas Sanders, Director of Government Accounting and Compliance for GA-ASI, conducted an internal audit in the Summer of 2018 to assess various compliance concerns with GAE's practices.

217.   Sanders issued his report on GAE's practices in August 2018. Sanders' report identified "gaps" with GAE's practices and made recommendations for addressing the issues and moving forward.

- 34 -

**j.    GA-ASI partially self-reports**

218.    On July 5, 2019, GA-ASI sent a letter to Cheryl Davis, the Director of the UAS

Contracts Directorate at the United States Army Contracting Command, partially reporting their

non-compliance with the FAR and DFARS.

219.    In its letter, GA-ASI explained that some of the costs related to work performed

by GAE were recorded on the basis of GAE's estimated cost rather than its actual cost.

220.    GA-ASI explained that this was in violation of FAR Subpart 31.205-26, which

states that transfers between affiliates must be on the basis of cost incurred.

221.    GA-ASI further explained that the subpart's exceptions likely did not apply. The

exceptions referenced are FAR Subpart 31.205-26(e)(1) and FAR Subpart 31.205-26(e)(1).

222.    GA-ASI also explained GAE's practice of adding 8% profit before transfer and

GA-ASI's practice of removing the profit as an unallowable cost after transfer.

223.    However, GA-ASI did not address its other non-compliance issues in the letter.

**k.    GA-ASI retaliates against Bevilaqua**

224.    In March 2018, at the recommendation of her manager, Bevilaqua applied for the

position as SCA of the team that oversaw GA-ASI's contracting with GAE.

225.    Upon starting the position, Bevilaqua was directed to execute the Commercial

Item Determination (CID) and LTA between GA-ASI and GAE to support the procurement of

Centurion 2.0 engines and spare parts.

226.    Bevilaqua immediately started to see red flags regarding how GA-ASI intended to

treat GAE with regard to the procurement process. Given Bevilaqua's experience in the industry,

she questioned management's direction to her that GAE be treated as a sub-contractor when by

all appearances, it was an affiliate of GA-ASI. Bevilaqua took her concerns to Gabriel "Vic"

- 35 -

Pascarella ("Pascarella"), her supervisor, and Derek Andrews ("Andrews"), the Vice President of Procurement.

227. In response, Pascarella and Andrews ignored Bevilaqua and directed her to complete the CID and LTA within two weeks.

228. In April 2018, Bevilaqua contacted the Human Resources Department and notified them that she was under an enormous amount of pressure to sign the LTA when she did not feel comfortable signing the LTA. Bevilaqua did not feel comfortable signing the LTA in light of her concerns that GAE was being improperly treated as a subcontractor.

229. In response, Hamlet Autman, a Human Resources representative, instructed Bevilaqua to take time off.

230. In April 2018, Bevilaqua took two days off from work.

231. During Bevilaqua's absence, Pascarella and Linda Garcia, one of the SCAs, executed the LTA on behalf of Bevilaqua without her knowledge or permission. Bevilaqua's name was identified as the Subcontracts Administrator responsible for the Procurement and price reasonableness of the LTA.

232. Upon Bevilaqua's return to work and in the months following, she continued to inquire about GA-ASI's improper contracting purposes and raising issues to Pascarella, Andrews, Duke, and GA-ASI Government Accounting and Compliance.

233. In July 2018, Duke and GA-ASI's government accounting team, including Bevilaqua and Sanders travelled to Dresden, Germany to meet with GAE management regarding the future ERSN.

234. However, following GA-ASI's site visit, GA-ASI and GAE did not immediately change any of their practices.

- 36 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

235.    Therefore, Bevilaqua continued to raise concerns. Bevilaqua's concerns were echoed by the August 2018 memorandum issued by Nicholas Sanders as a result of the site visit to GAE.

236.    In December 2018, Rich Terada ("Terada"), Procurement Director, told Bevilaqua that she would no longer be working for international subcontracting.

237.    When Bevilaqua asked Terada what she would be doing in Terada's department, Terada told her she would be working domestic development work under Lori Zehner, but details were still being worked out.

238.    In January 2019, Bevilaqua reported to GA-ASI's Human Resources department that she was being retaliated against for raising the concerns about GA-ASI's contracting practices.

239.    In the following weeks, and subsequently to sending her letter to HR in January 2019, Bevilaqua had no work as she was removed immediately from International Procurement.

240.    Annette Fox, Derek Andrews's executive assistant, informed Bevilaqua that she had been assigned to an office that served as the mother's lactation room. Bevilaqua was neither a mother nor breastfeeding. A co-worker heard Pascarella telling who he believed to be Duke on the phone, "There must be a closet for her."

241.    Meanwhile, on or about January 3, 2019, Annette Fox sent an email on behalf of Andrews announcing the promotion of Pascarella to the position of Director of International Procurement.

242.    In the January 3, 2019 email, Andrews stated that "[w]ith the growth in [GA-ASI's] international footprint and supply based, [GA-ASI's] International Procurement responsibilities have grown and will continue to do so." Andrews then demonstrated GA-ASI's

- 37 -

commitment to grow the international procurement department by telling employees that if they "are interested in pursuing this area of procurement, please let your manager know and consider taking classes to prepare for you future opportunities." International Procurement was the department from which Bevilaqua had just been removed.

243.    Bevilaqua's bonus did not increase at the end of 2018. Prior to Bevilaqua's concerns, Bevilaqua's bonuses had always increased. Further, Bevilaqua had received a promotion and assumed a lead role in 2018 which should have set her up for an increased bonus. Additionally, the bonus pool had increased compared to the prior year.

244.    In late January 2019, Bevilaqua was moved back to the International department and resumed position as GAE "lead." In response, GA-ASI initiated an investigation into Bevilaqua's claims of retaliation and substantive contracting improprieties.

245.    Even though Bevilaqua was assigned to the new role just before Christmas 2018, when she returned from the winter break, she was not assigned any tasks by Terada or his time for the first two weeks. When Bevilaqua asked why she was not being assigned any tasks, Terada informed her that he had no work to assign to her.

246.    During the third week, Bevilaqua was assigned some nominal tasks that had nothing to do with international procurement.

247.    In or around February 2019, GA-ASI hired Pillsbury Winthrop Shaw Pittman, LLP ("Pillsbury") as outside counsel. Attorneys from Pillsbury interviewed Bevilaqua on February 6-7, 2019 regarding her claims.

248.    In or around March 2019, Bevilaqua met again with Pillsbury counsel and Betty Washington from GA. At this meeting, Bevilaqua raised concerns that for years, GA-ASI was releasing purchase orders to GAE at price, not cost, which was a violation of CP-305.

- 38 -

I.    **GA-ASI retaliates against Gist**

249.    In or around September 2017, Bevilaqua and Gist disclosed and documented their relationship to GAE Legal Counsel, Charlotte Engstrom.

250.    In or around Summer 2018, Gist started raising concerns about GAE's value to the pending ERSN effort and their ability to properly handle cost contracting required for the effort in light of the open issues raised by Bevilaqua, specifically, that they have no cost accounting system.

251.    Eventually, Cliff Stone ("Stone"), the VP of Sustainment and Gist's supervisor at the time told Gist to stop voicing his concerns and to keep his head down. Subsequently, Mark was removed from ERSN effort though he was the Director of International Industrial Cooperation.

252.    After Bevilaqua started to raise concerns to Human Resources, and in turn to GA and Charlotte Engstrom, about her move as retaliation for addressing issues with GA-ASI's commerciality determination and GAE's high burden rates, Linden P. Blue became angry at Gist and dismissive of him in front of business partners, clients, and colleagues.

253.    After years of high performance reviews, in 2019, Linden P. Blue pressured Stone to issue Gist a performance review indicating that Gist "meets" expectations.

254.    On June 11, 2019, Gist submitted an anonymous complaint outlining much of the above concerns to the Defense Contract Management Agency.

255.    In or around July 2019, Gist communicated to Cliff Stone and David Heath that he was cooperating with the United States government.

256.    On or around August 5, 2019, Gist left a voicemail with the Army recommending an investigator speak to Bevilaqua about GA-ASI's illegal contracting activity.

- 39 -

257.    On or about August 20, 2019, Gist submitted a complaint to the DoD Complaint Hotline outlining the above fraudulent conduct and retaliatory conduct.

258.    In or around January 2020, Director of Human Resources for GA-ASI, Sharon Casali notified Gist that Gist would no longer be reporting to Stone, and instead, Gist would now be reporting to Chuck Wright ("Wright"), VP of International and Naval Programs, in a program director position.

259.    Casali was also the Human Resources representative involved in the investigation into reports or retaliation raised by Bevilaqua approximately one year prior.

260.    A Program Director position is a significant demotion and the role substantially reduces Gist's scope of work, duties and responsibilities, and his managerial oversight. Further, Gist upon learning the details of the role, Gist came to understand that the role is much more in line with a Program Manager role. Gist is a single contributor and oversees a budget of approximately $1.5 million, which is substantially less than what a Program Director typically oversees.

261.    Stone made clear to Gist that Stone was not part of the decision-making process but was notified of Gist's reassignment before the Christmas break. Stone was instructed not to tell Gist of the reassignment.

262.    Similar to Bevilaqua's demotion in December 2018, Gist was told that his reporting structure and title would change, but GA-ASI was not able to communicate Gist's new responsibilities and he was not immediately assigned any tasks. It was clear that the program director position was created purely for the purpose of reassigning Gist, without any business need to support the position.

- 40 -

263.    Despite GA-ASI being unable to communicate Gist's new responsibilities to Gist, Linden P. Blue announced to the company that Gist would be the director of a SIL.

264.    Gist was subsequently provided a job description and initial objectives by his new supervisor, Chuck Wright.

265.    The job description and initial objectives Wright shared with Gist were different than the description Linden P. Blue announced publicly to the company.

266.    Upon receiving the job description and initial objectives it became clear that the new role was highly technical, not within Gist's scope of training or experience, and was not fully supported by the necessary technical support staff. Further, Gist had been highly qualified for his prior role as Director of Corporate Offset and Industrial Cooperation. Gist had extensive experience in the industry. Gist was the President of the Executive Board of Defense Industry Offset Association and Chairperson of the Aerospace Industries Association Offsets Working Group.

267.    On or around January 20, 2020, Gist submitted a reply and follow up questions based on the job description and initial objectives to Wright.

268.    Gist notified Wright that he did not believe that he was the right person for the role. Gist emphasized that the role was highly technical in nature and that he did not feel that his experience aligned with the role. Gist also highlighted that he had been a program manager when he first started at GA-ASI over 16 years prior.

269.    In his reply, Gist also informed Wright and GA-ASI Human Resources that given the timing and the lack of explanation or justification for placing him in such an ill-fitting role, he believed he was being retaliated against.

- 41 -

## VI.  Damages

270.    As a result of GA-ASI's false claims, the government has sustained actual damages.

271.    The United States Army paid GA-ASI for costs that were unallowable under the FAR and DFARS because the costs were unreasonable, not allocable, or not supported by an appropriate commerciality determination and therefore not in compliance with the CAS.

272.    GA-ASI's false claims include the unreasonable costs associated with the material handling costs incorporated into the direct costs, indirect costs and general and administrative expenses associated with GAE's engines and hardware.

273.    GA-ASI's false claims also include the unreasonable upcharges of GAE's marketing and technical services resulting from GAE's failure to implement proper cost accounting and timekeeping systems.

274.    Finally, GA-ASI's false claims include expressly unallowable costs and other unallowable costs charged by GAE.

275.    GA-ASI paid approximately $16 million to GAE in 2018 and $15 million to GAE in 2019.

**COUNT I**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**Against All Defendants**

276.    Relators incorporate herein by reference and re-allege the allegations stated in the foregoing paragraphs.

277.   The False Claims Act imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

278.   Defendants knowingly present or cause to be presented to the United States, false claims, in order to obtain payment or approval when they:

     a.   Improperly allow products and services to pass through at price, not cost, as if GA-ASI and GAE are subcontractors as opposed to their true relationship, which is one of affiliates;

     b.   Charge unreasonable and unjustifiable rates for parts and services provided;

     c.   Charge the Government for unallowable expenses such as alcohol and equipment not allocable to the contract to which the equipment is charged.

279.   The United States, unaware of the falsity of the claims made by Defendants, and in reliance on the accuracy thereof, pay Defendants for such false claims.

280.   By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages.

281.   By virtue of these false claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

**COUNT II**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**
**Against All Defendants**

282.   Relators reallege and incorporate the allegations set forth above as though fully alleged therein.

- 43 -

283.    The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

284.    Defendants knowingly made or caused to be made, false records or statements material to the false and fraudulent claims when they:

      a.   Improperly allow products and services to pass through at price, not cost, as if GA-ASI and GAE are subcontractors as opposed to their true relationship, which is one of affiliates;

      b.   Classify transactions between GA-ASI and GAE as commercial by incorporating rates associated with non-commercial services into the rates for commercial items;

      c.   Fail to adhere to FAR requirements to implement a cost accounting system and timekeeping system at GAE;

      d.   Fail to audit the rates charged by GAE.

285.    The United States relied on these falsified records when it paid Defendant's claims.

286.    By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered actual damages.

287.    By virtue of these false claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

- 44 -

**COUNT III**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**
**Against All Defendants**

288.    Relators reallege and incorporate the allegations set forth above as though fully alleged therein.

289.    The False Claims Act imposes liability on any person who conspires to commit a violation of the False Claims Act, including any person who 1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; or 2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(C).

290.    Defendants GA-ASI entered into a conspiracy and took actions in furtherance of its conspiracies to defraud the United States Government to get fraudulent claims approved and paid for by the United States Army when it issued a waiver to CP-305, which will result in the transfer of engines, parts, and services at price between GAE and GA-ASI in violation of FAR Part 31.205-26(e).

291.    The result of GA-ASIs actions is that the United States Government will pay GA-ASI for parts and services that were transferred at price instead of at cost between GA-ASI and GAE, its affiliate entity.

292.    By virtue of these false claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from this conspiracy, such as false claims, trebled, plus civil penalties for each violation of the Act.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT IV**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**
**Against All Defendants**

293.    Relators reallege and incorporate the allegations set forth above as though fully alleged therein.

294.    The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G).

295.    Defendants GA-ASI knowingly and improperly avoided an obligation to pay or transmit money or property to the Government when it submitted a letter to the United States Army on or about July 5, 2019 to partially disclose its noncompliance with the regulations outlined in the FAR but did not reimburse the United States Army for excessive charges resulting from GA-ASI's noncompliance.

296.    By virtue of these false claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from this conspiracy, such as false claims, trebled, plus civil penalties for each violation of the Act.

**COUNT V**
**Violation of the False Claims Act**
**31 U.S.C. § 3730(h)**
**Against Defendant GA-ASI by Relator Bevilaqua**

297.    Relators reallege and incorporate the allegations set forth above as though fully alleged therein.

298.    Bevilaqua is an "employee" as that term is used in 31 U.S.C. § 3730(h).

- 46 -

299.   Bevilaqua engaged in protected activity under the FCA when she disclosed to Human Resources that the 2018/2019 LTA between GA-ASI and GAE was supported by an inadequate CID and that the rates charged by GAE were unreasonable.

300.   GA-ASI retaliated against Bevilaqua when it removed her from her SCA role, relocated her to the mothers' breastfeeding room, and did not increase her bonus despite her promotion and an increase in the size of the bonus pool.

301.   GA-ASI's violation of 31 U.S.C. § 3730(h) have caused and will continue to cause Bevilaqua to sustain economic and other harm, including, but not limited to, the loss of employment opportunities, the loss of future earning power, back pay and front pay, and interest.

302.   GA-ASI's violations of 31 U.S.C. § 3730(h) entitle Bevilaqua to reinstatement with the same seniority status that he would have had but for GA-ASI's unlawful retaliation and Bevilaqua's special damages sustained as a result of the retaliation, including his litigation costs, expert witness fees, and attorney fees.

**COUNT VI**
**Violation of the False Claims Act**
**31 U.S.C. § 3730(h)**
**Against Defendant GA-ASI by Relator Gist**

303.   Relators reallege and incorporate the allegations set forth above as though fully alleged therein.

304.   Gist is an "employee" as that term is used in 31 U.S.C. § 3730(h).

305.   Gist engaged in protected activity under the FCA when he disclosed to Stone that the rates charged by GAE were unreasonable.

306.   GA-ASI retaliated against Gist when it demoted him to a director position and when it downgraded his performance reviews from "exceeds expectations" to "meets expectations."

- 47 -

307.   GA-ASI's violation of 31 U.S.C. § 3730(h) have caused and will continue to cause Gist to sustain economic and other harm, including, but not limited to, the loss of employment opportunities, the loss of future earning power, back pay and front pay, and interest.

308.   GA-ASI's violations of 31 U.S.C. § 3730(h) entitle Gist to reinstatement with the same seniority status that he would have had but for GA-ASI's unlawful retaliation and Gist's special damages sustained as a result of the retaliation, including his litigation costs, expert witness fees, and attorney fees.

## PRAYER FOR RELIEF

WHEREFORE, Relators, acting on behalf of and in the name of the United States of America, and on their own behalves, demand and pray that judgment be entered against the Defendants for violations of the federal False Claims Act as follows:

(a)   In favor of the United States against the Defendants for treble the amount of damages to the DoD for the submission of false claims for payment plus the maximum civil penalties for each violation of the Federal False Claims Act;

(b)   In favor of the Relators for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney fees and costs incurred by Relators;

(c)   In favor of Relator Bevilaqua for the maximum relief allowed under 31 U.S.C. § 3730(h)(2), including 2 times the amount of back pay, interest on the back pay, and compensation for special damages sustained as a result of the retaliation, including litigation costs, expert witness fees, and reasonable attorneys' fees;

(d)   In favor of Relator Gist for the maximum relief allowed under 31 U.S.C. § 3730(h)(2), including 2 times the amount of back pay, interest on the back pay, and

compensation for special damages sustained as a result of the retaliation, including litigation costs, expert witness fees, and reasonable attorneys' fees;

(e)     For all costs of the federal False Claims Act civil action;

(f)     In favor of the Relator and the United States for further relief as this court deems to be just and equitable; and

(g)     Such other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a jury trial.

Respectfully Submitted,

Hamilton Arendsen
Arendsen Cane Molnar LLP
550 West C Street, Suite 1150
San Diego, CA 92101
(619) 535-3910 (phone)
(619) 535-3920 (facsimile)

R. Scott Oswald, Esq. (*Pro Hac Vice to be filed*)
Janel Quinn, Esq. (*Pro Hac Vice to be filed*)
Lydia Pappas, Esq. (*Pro Hac Vice to be filed*)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, DC 20006
(202) 261-2813 (phone)
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
jquinn@employmentlawgroup.com
lpappas@employmentlawgroup.com

*Counsel for Relators*

```
DUPLICATE

Court Name: USDC California Southern
Division: 3
Receipt Number: CAS119314
Cashier ID: naparici
Transaction Date: 02/18/2020
Payer Name: LAW OFFICES OF HAMILTON A
-------------------------------------
CIVIL FILING FEE
 For: LAW OFFICES OF HAMILTON A
 Case/Party: D-CAS-3-20-CV-000297-001
 Amount:      $400.00
-------------------------------------
CHECK
 Check/Money Order Num: 2086
 Amt Tendered:  $400.00
-------------------------------------
Total Due:      $400.00
Total Tendered: $400.00
Change Amt:     $0.00


There will be a fee of $53.00
charged for any returned check.
```